## Pearce *versus* Langfit.

1. Delivery of a letter, duly stamped, to a U. S. letter carrier, while on his rounds, is a legal mailing thereof.

2. The cashier of a bank in Allegheny City enclosed a notice of protest of a promissory note in an envelope duly stamped, and addressed to the indorser, and handed it personally to a letter carrier when he came into the bank on his official rounds to deliver and collect mail: *Held*, that this was a legal mailing to charge the indorser, though he denied receipt of the notice.

3. A judge, in charging the jury, has the right to correct erroneous statements made by counsel in addressing the jury as to geographical facts and the distances between well known cities in the United States. The ordinary speed of railway trains between such cities may also be a matter of judicial cognizance, but it may be doubted that a court should take judicial cognizance of the schedule time for the departure and arrival of trains.

4. An offer of evidence by defendant, in sur-rebuttal, which is inconsistent with his own testimony previously given, and which, upon the theory of such previous testimony, is irrelevant, though tending to rebut certain evidence given on behalf of the plaintiff, is inadmissible.


November 24th 1882.    Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

ERROR to the Court of Common Pleas of *Butler county :* Of January Term 1882, No. 323.

Assumpsit on the following promissory note, by W. J. Langfit, last indorser against John Pearce, a prior indorser.

$1,000.                        New York, December 19th 1876.

Ninety days after date I promise to pay to the order of Austin Pearce, One thousand dollars, at Ninth National Bank, New York.            Value received.

(Signed)        D. P. BARNHART.

(Indorsed)    Austin Pearce.        Elias Zeigler.

John Pearce.        W. C. Latchaw.

W. J. Langfit.

On the trial, before BREDIN J., the following facts appeared :—The note was discounted for Austin Pearce, by the People's Savings Bank of Allegheny City.    The People's Savings Bank sent the note to their correspondent at New York for collection, and on the day of its maturity, to wit, March 14th 1877,

it was presented for payment at the Ninth National Bank, New York, when payment was refused and it was duly protested for non-payment. The note, protest and notices for all the indorsers were returned by mail to the People's Savings Bank at Allegheny City, and the cashier at that institution, immediately on receiving the same, on the forenoon of either the 15th or 16th of March, 1877, ascertained from Austin Pearce the post-office address of the indorsers, enclosed the notices of protest in envelopes addressed to them respectively, duly stamped, and delivered said letters to the United States mail carrier, when he, while on his official route, came into the People's Savings Bank to deliver and collect mail. The cashier testified that such was his usual course of business in mailing letters, viz: to give them to the carrier, and not to mail them at the post-office.

The plaintiff afterwards, on March 27th 1877, paid the note to the People's Savings Bank, by his check for $1,003.81 drawn against his account which he kept in said savings bank, and when his account was next balanced the note was returned to him with his cancelled checks.

The defendant denied having received notice of protest, and testified that the first knowledge he had that the note was not paid at maturity was when the writ in this case was served upon him.

Austin Pearce testified, on behalf of the defendant, that learning from Dr. Langfit that the note had been returned from New York, unpaid, he called at the People's Savings Bank, and paid the note either by a check or in money, he did not remember which, and left the note with the bank for collection from Barnhart the maker.

It further appeared by the plaintiff's testimony that a few days before the plaintiff gave his check to the People's Savings Bank in payment of the note in suit, Austin Pearce gave plaintiff a note of one Abbott, for $2,000, which upon the plaintiff's indorsement was discounted and the proceeds placed to plaintiff's credit in the People's Savings Bank. The defendant claimed, therefore, that while the Barnhart note was paid by plaintiff's check, yet it was really paid with the money of Austin Pearce, being the proceeds of the Abbott note. This Abbott note was not paid at maturity, and the plaintiff testified that he paid it, and afterwards finding it worthless, gave it to Austin Pearce for fifty cents. On January 29th 1878, Austin Pearce had a settlement with Langfit of the amount of his indebtedness to Langfit, fixing it at $1,100, for which he, Pearce, gave his note to Langfit, together with twenty-four shares of railroad stock as collateral thereto; this $1,100 note was not paid and the plaintiff, at the time of trial, held the same with the railroad stock as collateral, which stock the plaintiff, at Pearce's re-

[Pearce *v.* Langfit.]

quest, in order to withdraw it from the reach of other creditors, had caused to be transferred to his own name.

The defendant, to rebut this testimony, then recalled Austin Pearce, and made the following offer:—

"Defendants' counsel offer to show by the witness on the stand in sur-rebuttal, that it is all true that he had an arrangement with Dr. Langfit, the plaintiff in this suit, by which these 24 shares of stock were held as collateral by the doctor for this $1,100 note from the 27th of March 1877, or from the time the stock was given to Dr. Langfit, up to about the 28th of August 1878, when on the 28th or about the 28th of August 1878, a new arrangement was made in parol by which Dr. Langfit agreed that he would take these 24 shares of stock as absolute payment of the $1,100 note for which he had held them up to that time as collateral; that in pursuance thereof a transfer of them was made and signed in the hand-writing of the secretary of the company, endorsed on the certificates of stock, which were held and voted on by the plaintiff, from that day to the present time, received and were treated as absolute payment and satisfaction of this $1,100 note; this to contradict the plaintiff's testimony in which he swears that this stock was held only as collateral and that he at no time received the stock as payment, and to show that he paid the note by a transfer of the stock.

"Plaintiff's counsel objects to this as not being sur-rebuttal but their case in chief.

"By the court. We sustain the objection because the witness on the stand, when examined previously testified that he had paid the note by check or money and there is now an attempt to set up in sur-rebuttal a different position altogether, and to show payment by transfer of stock in a railroad company; a party cannot be permitted to change his position in that way; we reject the evidence; we think this is a change of front, and defendants cannot be permitted to do that; we sustain the objection and give an exception."

Counsel for defendant, in his address to the jury, in commenting on the improbability of plaintiff's testimony, stated that it was over five hundred miles from New York, and that notices of non-payment and protest could not be received in Allegheny City on the day after the note was protested. The court, in the charge, said:—"The testimony of the cashier of the bank in Allegheny and Dr. Langfit is that within a day or two after the protest, the notices of protest for non-payment were received in Allegheny. The counsel for defendants has stated to the jury that it is absurd and has made some statements in regard to the distance from Pittsburgh to New York, that are probably entitled to correction. It is not over 500 miles. It is 444 miles. Perhaps some of the jurors know that as well as the court.

[Pearce *v.* Langfit.]

There is no improbability in the notices being received the day after the note was due.   It is well known that a train leaving New York between five and six o'clock in the evening, if on time, would reach Pittsburgh the next morning at eight o'clock. Perhaps the counsel who made the statement has often come on that train.   Then there is another train leaves the same night, that would get to Pittsburgh about one o'clock the next afternoon.   So there is nothing improbable in the notices being received the next day.   They may not have been received until the second day, but that does not matter.   The question is not whether they were received on the first day or on the second day, but whether these notices were promptly sent by the persons in Allegheny to Pearce and Ziegler, the defendants here. . . . .   If you believe Mr. Young's statement that he did deliver these notices of non-payment, enclosed in envelopes properly stamped, to the United States mail carrier, that is. sufficient evidence that the notices were sent.   After being delivered to the mail carrier the plaintiff or the bank has no further responsibility.   All they have to do is to show that they mailed the letters, enclosing the notices of non-payment.   It is sufficient to show that was done.   By handing them to the mail carrier it has the same effect as though taken to the post-office and put in the letter box.   All that is required is to mail them. Where there is no mail carrier for that purpose they must be delivered at the post-office, to the postmaster or his clerk or put in the proper box, but in the cities, mail carriers deliver letters and collect them ; therefore being handed to one of them, is the same as though delivered to the postmaster.   He is an officer of the United States, and to hand the notices to him properly stamped and addressed, has the same effect as though handed to a clerk in the post-office . . . .   Of course we could not allow the defendants to change front here and say one moment that Austin Pearce had paid the note by a check or cash and afterwards say he had paid it by a transfer of stock.   After the plaintiff had closed his case Austin Pearce came on the stand to say he had paid it by a transfer of stock in the railroad company. That would be a kind of double dealing that could not be allowed."

Verdict for plaintiff, $1,276, and judgment thereon.   The defendant took this writ of error, assigning for error the rejection of his offer of evidence as above, and the portions of the charge above quoted.

*J. M. Thompson* (*C. Walker* with him), for the plaintiff in error.—In the absence of testimony the courts may not, on the theory of taking judicial notice of common facts, assume and state distances and railway time-tables between cities ; nor, that

the system of free mail delivery and collection exists by order of the postmaster. While depositing a letter in a receiving box may be a legal mailing, delivery to one said to be a letter carrier is not: Weakly v. Bell, 9 Watts 279.

J. W. Kirker and John M. Greer, for the defendant in error, cited, on the point that delivery of a stamped letter to a mail carrier is a legal mailing: U. S. Postal laws and regulations p. 18, Regulation 21. "Carriers are required, while on their rounds, to receive all letters prepaid by postage stamps that may be handed to them for mailing:" Skilbeck v. Garbett, 7 Ad. & El. N. S. 846 (53 E. C. L. R. 844) s. c., 9 Jurist part 1 p. 939; Pack v. Alexander, 3 Moore & Scott 789.

Mr. Justice GREEN delivered the opinion of the court, December 30th 1882.

We think the delivery of a letter to an official letter carrier is the full equivalent for depositing it in a receiving box or at the post-office. When left in the former it is for the purpose of being taken therefrom by the carrier, and if left at the post-office it must be taken from the receptacle there provided for its deposit, either by the postmaster or by some one of his agents, to be placed in the mail. In either case the letter must come into the personal custody of some one lawfully authorized for the purpose, whose function it is to participate in the transmission of it from the sender to the mail.

It certainly can make no difference whether the letter is handed directly to the carrier, or is first deposited in a receiving box and taken from thence, by the same carrier. In the case of Skilbeck v. Garbett, 7 Ad. & El. N. S. p. 846, in which the very point was decided, Lord DENMAN, C. J., said, "If a public servant belonging to the post-office, takes charge of the letter in the exercise of his public duty, it is the same as if it were carried to the office." The postal regulations of the United States require that carriers while on their rounds shall receive all letters prepaid that may be handed to them for mailing. It follows that when such a carrier receives a prepaid letter from a citizen for the purpose of being mailed, he is in the strict performance of his official duty.

On the trial the learned judge of the court below, to correct an alleged misstatement of the counsel for the defendant in his summing up to the jury, as to the distance from New York to Pittsburgh, said to the jury that the distance was not over 500 miles, as has been asserted by counsel, but only 444 miles, and added that perhaps some of the jurors knew that, as well as the court. The judge also said it was well known that a train leaving New York between five and six o'clock P. M. of one day,

[Pearce *v.* Langfit.]

would reach Pittsburgh by eight o'clock the next morning, if on time. We think, if counsel erroneously made a statement as to the distance between the two cities, it was the right of the court to correct the error by stating the true distance. This is a matter of the geography of the country. In 1 Whart. on the Law of Evidence at section 335 et sequitur, the writer states numerous matters of which courts will take judicial notice and amongst many others, enumerates " distances as calculated by a map :" and " the ordinary time of voyages." In § 340 he says : " A court is bound to take judicial notice of the leading geographical features of the land, the minuteness of the knowledge so expected being in inverse proportion to distance. Thus a court sitting in a particular city is bound to know the general scenery of such city, and its division into streets and wards : the courts of a particular state, to know the boundaries of the state, and its division into towns and counties and the limits of such divisions : and of its judicial districts, the positions of leading cities and villages in such state, and the natural boundaries of the state," citing numerous authorities in support of his text. We apprehend that the ordinary speed of railway trains is a matter of judicial cognizance, and hence a very simple computation will demonstrate with approximate certainty the time within which mails may be transported between such cities as New York and Pittsburgh. It may be doubted that a court should take judicial notice of the particular hours when trains leave their points of departure. But what the court said was that there was nothing improbable in the idea that a notice of protest could reach Pittsburgh the day following the maturity of the note. There was certainly no error in this. Perhaps the learned judge went too far in stating that a train leaving New York at five or six in the evening would reach Pittsburgh the next morning at eight, but if he was in error in so saying it is quite immaterial, for the reason that the cashier and the plaintiff had both testified that the notices were received at the bank within a day or two after the maturity of the note. The note was due, and was protested in New York on the 14th of March, and the two witnesses named testified that the note and notices of protest were received on either the 15th or 16th of March at the bank. There was therefore actual testimony in the case upon which the remark of the judge could rest in substance.

The only remaining assignment of error that is pressed in argument, is the one relating to the rejection of the defendant's offer of proof as to the 24 shares of stock having been given and accepted in satisfaction of the $1,100 note. We cannot see how, upon the theory of the defendant, or upon the testimony of his witness, Austin Pearce, this offer of testimony was in any way relevant. The witness was permitted by the court to tes-

[Pearce v. Langfit.]

tify that this note was not collateral to the one in suit, and thereupon he did testify most positively that it was not given as collateral to any debt, that "it was not a collateral note, but a straight note and had nothing to do with the note in suit." If this were so, of what possible consequence was it to prove that the 24 shares of stock were given as collateral to this $1,100 note and subsequently accepted in satisfaction of it? Clearly none. If admitted, it would but prove the payment of the $1,100 note, which the witness had sworn had nothing to do with the $1,000 note in suit, and the latter note would remain unaffected by the proof. If it had been offered to prove payment of the $1,000 note, which is not stated in the offer, then it would have been fairly subject to the animadversion of the court. For the witness had in fact already sworn that he had himself paid the note in suit with money or a check, a long time previously. To permit the same witness after that, to swear that he had paid the note, not by a check or with money shortly after its maturity, but in a totally different manner, to-wit by a transfer of stock made more than a year later, would be to allow the witness to swear that his first testimony was false. Had the judge permitted such testimony to be given, as he might have done if it had been offered, it would have been his duty to say to the jury that such a witness was entitled to no credit. As it was rebutting testimony of the defendant which he might have offered in chief, it was within the discretion of the court to receive or reject it, if it was offered for the purpose now referred to, and therefore not the subject of error. But we do not understand it in this way. The offer is distinct to prove that the shares were originally given as collateral to the $1,100 note and afterwards accepted in payment of it. That note, the defendant proved by this very witness, had no connection with the note in suit and therefore the offer was to prove irrelevant matter and was rightly rejected.

Judgment affirmed.

### Zeigler v. Langfit.

GREEN, J. For the reasons stated in the foregoing opinion the judgment in this case is affirmed.

Judgment affirmed.